UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHN A. HARRINGTON.

                                        Plaintiff,

      v.                                        5:17-CV-53
                                                (TJM/DEP)

JAMESVILLE DEWITT CENTRAL SCHOOL
DISTRICT and BOARD OF EDUCATION OF THE
JAMESVILLE CENTRAL SCHOOL DISTRICT,

                                        Defendants.
_____

Thomas J. McAvoy, S.U.S.D.J.

                          DECISION & ORDER

      Before the Court is Defendants' motion for judgment on the pleadings in this case,

that alleges violations of Plaintiff's constitutional rights in school disciplinary proceedings.

See dkt. # 7.  The parties have briefed the issues and the Court has determined to decide

the matter without oral argument.

I.    Background

      This case arises out of discipline meted out against Plaintiff John A. Harrington by

Defendant Jamesville Dewitt Central School District when Plaintiff was a high-school

student in 2015.  See Complaint ("Complt."), dkt. # 1.  Plaintiff alleges that at the time

relevant to this action, he was a student at Jamesville-DeWitt High School.  Id. at ¶ 7.  He

was a member of the National Honor Society, an Honor student, and "well-regarded and

well-liked by his teachers and peers alike."  Id.  He had no history of academic discipline

and faced no allegations of academic dishonesty during his twelve years in the School

District.  Id. at ¶ 8.

1

In 2013, Plaintiff received a medical diagnosis of severe depression and anxiety. Id. at ¶ 9. He also suffered from severe allergies and "other debilitating medical conditions. Id. Plaintiff was required to take several extended leaves of absence from school. Id. In 2014, Plaintiff underwent hospitalization for suicidal thoughts. Id. at ¶ 10. Plaintiff alleges that he informed the District and his teachers of his illnesses, including his emotional state. Id. The District was also aware of the frequent absences he suffered in 2014-2015 because of his symptoms. Id. The District had also received updated medical information from Plaintiff's physician. Id. at ¶ 11. Plaintiff does not allege that he requested any accommodations for his disability from the District or that he used any programs available to disabled students at the High School.

This lawsuit arises out of Plaintiff's participation in a high school course titled "Writing 105: Practices of Academic Writing," which was a course offered through Syracuse University's "Project Advance" ("SUPA") program. Id. at ¶ 12. Students who enrolled in SUPA classes could gain both high-school and college credit. Id. Their high school teachers taught the classes. Id. Plaintiff alleges that the District represented that Connie Myers-Kelly, who taught the class in question, had been trained and approved by Syracuse to teach the course. Id. at ¶¶ 13-14. Course materials promised that any writing assignments would involve extensive editing and input form the instructor, and would involve several revisions. Id.

Plaintiff submitted Myers-Kelly an essay on January 26, 2015. Id. at ¶ 15. Plaintiff alleges that "[a] portion of the paper contained quotations from an outside source, which were clearly attributed in the paper to their original speaker, but were not properly cited." Id. He contends that he turned the paper in "without realizing that the required citations were missing, but with no intention to claim the outside material as his own work." Id.

2

Plaintiff alleges that he had been experiencing a great deal of school-related stress at this time, which exacerbated his underlying health issues and made completing schoolwork more difficult. Id. at ¶ 17. Plaintiff's anxiety made him unable "to . . . complete [properly] the SUPA assignment without constructive assistance from the course instructor and the District." Id. at ¶ 19. Plaintiff's preparations to perform a lead role in the school play was also occurring at this time. Id. at ¶ 18. Participation in theater "provided him with a significant and necessary therapeutic outlet for him to cope with his condition." Id.

Plaintiff turned in the essay. Id. at ¶ 20. His teacher, Myers-Kelly, "accused Plaintiff of plagiarism and reported it to the High School's administration." Id. at ¶ 20. Plaintiff alleges that Myers-Kelly failed to confront him directly with her allegation. Id. He had no knowledge that she had informed administrators of her charge. Id. Plaintiff contends that his essay did not violate the District's rules on plagiarism in his assignment. Id. at ¶¶ 21-22. He also contends that he "was also never given a hearing or opportunity to respond to these allegations of plagiarism or to clear his name or defend himself against this false allegation." Id. at ¶ 22. The District, he insists, "basically found [him] guilty of plagiarism, even before they had ever met with him or his parents" without due process of law. Id. The "false allegation" that Plaintiff had plagiarized "went viral and spread throughout the school and local community almost instantly." Id.

Plaintiff alleges that on February 3, 2015, Assistant Principal David Nylen summoned him to his office. Id. at ¶ 23. Myers-Kelly was also there. Id. Myers-Kelly and Nylen "summarily" informed Plaintiff that he was being disciplined for intentional plagiarism. Id. They had not spoken to Plaintiff. Id. Plaintiff was not provided any prior notification of this accusation, and he had no chance to contest it. Id. at ¶ 24. No one called Plaintiff's parents to inform them of the accusation or disciplinary action. Id. The

punishment assigned to Plaintiff was an "F" grade on the written assignment and two days of after-school detention.  Id. at ¶ 25.  Administrators also barred Plaintiff from participating in the school play.  Id.  The play was scheduled to open on February 5th.  Id.

Plaintiff's parents spoke with Principal Paul Gasparini.  Id. at ¶ 26.  Gasparini claimed "he understood the magnitude of the situation."  Id.  He recognized the "consequences that could occur from the humiliation and embarrassment that Plaintiff suffered."  Id.  Gasparini nevertheless "affirmed" the punishment Plaintiff was to receive.  Id.  Plaintiff further alleges that Gasparini's statement that "'[n]o one will remember this in two weeks" demonstrates his deliberate indifference to Plaintiff's plight.  Id.

On February 3, 2015, shortly after learning of his punishment, Plaintiff went to his chorale class.  Id. at ¶ 27.  There, Ms. Quackenbush, who taught the class and "was in charge of" the play, "escorted" Plaintiff from the class.  Id.  Quackenbush "compelled" Plaintiff to give up his role in the play because of the plagiarism accusation.  Id.  Plaintiff's fellow students and others in the community became aware of Plaintiff's removal from the play on that day.  Id. at ¶ 28.  Two days later, when the play opened, audience members could be heard discussing the plagiarism charges against Plaintiff; the "accusation of academic dishonesty and punishment had quickly spread from the school throughout the local community and amongst Plaintiff's peers."  Id.

Plaintiff alleges that this damage to his reputation continued even after high-school graduation in the spring of 2015.  Id. at ¶ 29.  On September 15, 2015, a teacher at the school, Joe DeChick, used Plaintiff's experience as an example of the consequences of plagiarism.  Id.  DeChick did not use Plaintiff's name, but Plaintiff alleges that "there was no question in the minds of the students that these comments referred to Plaintiff[.]"  Id.  Many students, after all, "had been made aware by District personnel that Plaintiff was

4

accused of and disciplined for plagiarism earlier that year." Id.  Plaintiff alleges that DeChick told the class that "last year someone got caught!  It was pretty messy.  People were relying on him for the play but he couldn't participate!  Now there are lawyers involved.  Don't plagiarize kids.  We thought he was a reliable student." Id. at ¶ 30.

Plaintiff contends that his treatment by the school district resulted in "embarrassment, humiliation, and severe emotional distress." Id at ¶ 32.  The District's conduct "exacerbated" Plaintiff's depression and anxiety, and he was forced to obtain additional medical care, medication and counseling. Id. at ¶ 33.  Plaintiff's physician recommended that he be excused from school for 60 days. Id. at ¶ 34.  When his condition did not improve during that time, Plaintiff did not return to school for the remainder of his senior year. Id.  Plaintiff does not allege that the District ordered his absence from school at that time as punishment.

Plaintiff filed the instant Complaint on January 18, 2017.  The Complaint contains seven causes of action under New York and federal law.  Count One, brought pursuant to 42 U.S.C. § 1983, alleges a violation of Plaintiff's 14th Amendment due process rights.  Count Two raises a Section 1983 equal protection claim under a "stigma plus" theory.  Count Three raises the same claim under the New York Constitution.  Count Four is a procedural due process claim under the New York Constitution.  Count Five alleges that Defendants committed a Federal constitutional due process violation by discriminating against Plaintiff on the basis of his disability.  Count Six asserts that Defendant violated Section 504 of the Rehabilitation Act of 1973 by discriminating against Plaintiff because of a disability.  Count Seven alleges that Defendant violated the New York State Human Rights Law ("NYSHRL"), Executive Law § 296.

Defendants answered the Complaint and then filed the instant motion for judgment

on the pleadings.  The parties then briefed the issue, bringing the case to its present posture.

## II.     Legal Standard

Defendants move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  "Judgment on the pleadings is appropriate where material facts are undisputed and where on the judgment on the merits is possible by considering the contents of the pleadings."  Selters v M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).   Courts "employ the same standard applicable to Rule 12(b)(6) motions to dismiss[.]"  Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 78 (2d Cir. 2015). Under that standard, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Fink v. Time Warner Cable, 714 F.3d 739, 741 (2d Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2007)).  In evaluating a 12(c) motion, "the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'"  L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (quoting Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009)).  The Complaint also includes "'any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint.'"  Id. (quoting Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004)).

## III.    Analysis

Defendants seek dismissal of the claim on various grounds, which the Court will

address in turn.[1]

### A. Constitutional Claims

### i. Due Process

### a. Property Interest

Defendants first seek dismissal of Plaintiff's due process claims.  First, Defendants contend that Plaintiff has not alleged the deprivation of any constitutionally protected property or liberty interest and therefore cannot make out a claim.

Plaintiff's first cause of action alleges that his Fifth- and Fourteenth-Amendment right to due process was violated when Defendants denied his "property interest in his right to attend public school at the District without due process of law when he was falsely

---

[1] The Court notes that Plaintiff's Complaint is brought only against the Defendant School District and the Board of Education of the School District.  Plaintiff offers no particular allegations against the Board of Education, and points to no particular policy, custom or practice by either Defendant that he contends led to a violation of his constitutional rights.  Instead, his theory of liability appears to be one based on the *respondeat superior* doctrine.  In other words, he seeks to hold the Defendants accountable for the conduct of District employees operating in the course and scope of their employment.  Such allegations cannot state a federal claim under Section 1983. Liability for a governmental entity is limited under Section 1983 by Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  In that case, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006).  To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Bd. of County Commr's v. Brown, 520 U.S. 397, 403 (1997).  "A government's official policy may be 'made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 142 (2d Cir. 1999) (quoting Monell, 436 U.S. at 694).  Claims against the Defendants here could be proved by showing that Plaintiff's rights were violated "pursuant to a governmental custom, policy, ordinance, regulation, or decision."  Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).  Plaintiff must demonstrate "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  Id.  Plaintiff offers no such allegations here. Defendants do not raise this issue, however.  Since the Court finds that the Complaint can be disposed of on grounds raised by the Defendants, the Court will not address that issue.

accused of plagiarism and disciplined without any adequate due process or notice or opportunity to be heard." Complt. at ¶ 39. A Plaintiff who raises a procedural due process claim "must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process." Hynes v. Squillace, 143 F.3d 636, 658 (2d Cir. 1998). An "elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). In other words, "[d]ue process requires notice and the opportunity to be heard." Interboro Inst., Inc. v. Foley, 985 F.2d 90, 93 (2d Cir. 1993). "[N]otice" must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Id. In determining whether notice was adequate, the Court "focuses on the reasonableness of the chosen means, not whether the affected persons actually received notice." Brody v. Village of Port Chester, 4343 F. 3d 121, 127 (2d Cir. 2005). An "opportunity to be heard must be 'at a meaningful time and in a meaningful manner.'" Karpova v. Snow, 497 F.3d 262, 270 (2d Cir. 2007) (quoting Mathews v. Eldrige, 424 U.S. 319, 333 (1976)).

This case involves the constitutional rights of a high-school student. "Our cases make clear that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" Morse v. Frederick, 551 U.S. 393, 396 (2007) (quoting Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506 (1969)). Still, "'the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings[.]'" Id. at 396-397 (quoting Bethel

School Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986)).  Courts may consider "that the rights of students 'must be applied in light of the special characteristics of the school environment[.]'"  Id. (quoting Hazelwood School Dist. Kuhlmeier, 484 U.S. 260, 266 (1988)).

Defendants' position is that Plaintiff has failed to allege that he was deprived of a constitutionally protected property or liberty interest that would entitle him to notice and an opportunity to be heard.  The stated property interest here is an interest in the right to attend a public school.  "Protected interests in property are normally 'not created by the Constitution.  Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits."  Goss v. Lopez, 419 U.S. 565, 572-73 (1975) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).  If a State provides "the right to an education to" a class of persons, the State "may not withdraw that right on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred."  Id. at 574.  The Second Circuit Court of Appeals has found that the New York Constitution creates a right to a free public education for individuals younger than twenty-one, and in so doing creates "a property interest in education protected by the Fourteenth Amendment."  Handberry v. Thompson, 446 F.3d 335, 353 (2d Cir. 2006).

Plaintiff first complains that his constitutional rights were violated because he faced two days of after school detention because of the plagiarism allegations.   Plaintiff contends that these detentions deprived him of his right to an education.  Courts in this Circuit have found that the property right in education in New York is "the right to participate in the entire educational process and not the right to participate in each individual component of that process."  Mazevski v. Horseheads Cent. Sch. Dist., 950

9

F.Supp. 69, 72 (W.D.N.Y. 1997).  A claim arises, therefore, when Plaintiff is somehow

excluded from an activity.  As the Supreme Court has found, "the total exclusion from the

educational process for more than a trivial period, and certainly if the suspension is for 10

days, is a serious event in the life of the suspended child.  Neither the property interest in

educational benefits denied nor the liberty interest in reputation, which is also implicated,

is so insubstantial that suspensions may constitutionally be imposed by any procedure the

school chooses, no matter how arbitrary."  Goss, 419 U.S. at 576.

Here, Plaintiff was not suspended from school or denied an education when the

district imposed detention on him for his alleged plagiarism–he was punished by having to

spend more time at school.[2]  Plaintiff has therefore failed to plead any facts indicating he

was deprived of a protected property right.  He did not serve any detention; after a

meeting with Plaintiff's parents on February 5, 2015, Principal Gasparini "revoked the

detentions."  See Letter to Susan Petrosillo, Dated 12/1/15, Ex h. A to Plaintiff's Complaint

---

[2]New York's right to notice and a hearing before a suspension lasting five days or
more does not apply to this case; Plaintiff was never suspended but simply disciplined.
See N.Y. Educ. L. § 3214(3)(b)(1) (when student is suspended up to five days "the
suspending authority shall provide the pupil with notice of the charged misconduct.  If the
pupil denies the misconduct, the suspending authority shall provide an explanation of the
basis for the suspension.  The pupil and the person in parental relation to the pupil shall,
on request, be given an opportunity for an informal conference with the principal at which
the pupil and/or person in parental relation shall be authorized to present the pupil's
version of the event and to ask questions of the complaining witnesses."); Appeal of R.J.
and D.J., on behalf of their daughter A.J., from action of the Board of Education of the
Jamesville-Dewitt School Dist., 44 Ed Dept. Rep., Decision No 15145, 2004 W L 6040009
(Nov. 24, 2004) ("Holding an informal conference with the principal does not excuse the
requirement for written notification to students and their parents and/or guardians
explaining their rights to the conference and the opporutnity to question complaining
witnesses.").

("Petrosillo Letter"), dkt. # 1-1, at 6.[3]  Thus, even if the Court were to consider the

detention a deprivation of a property right, Plaintiff could not prevail on the claim.  The

process he received actually worked to prevent the loss of whatever right he had to avoid

the punishment.

Plaintiff also complains that his constitutional rights were violated because the

plagiarism allegations prevented him from participating in the school play; he could not

prevail on this claim, even though failing to participate in the play is the only actual denial

of an opportunity to participate in a school function he alleges.  A student's "exclusion from

a particular course, event or activity is of no constitutional import."  Mazevski, 950 F.Supp.

at 72.  In Mazevski, for instance, the court found that the plaintiff lacked "a protectible

property interest in participation in the Marching Band–whether viewed as a curricular or

---

[3]This letter would also seem to acknowledge that Plaintiff received notice and an opportunity to be heard with reference to the detentions.  The letter relates that:

> On February 5, 2015, Mrs. Harrington sent Ms. Bond an email asking for a hearing to determine whether Jack had committed plagiarism and, if so, what penalty would be appropriate.  No hearing was ever provided by the District.  Later on February 5, 2015, the Harringtons met with Mr. Gasparini, Mr. Nylen and Mr. Dowdell to explain that Jack had simply neglected to provide a proper citation for that portion of the Writing 105 assignment that he had obviously quoted from another source. Mr. Gasparini appeared to understand the magnitude of what was happening, including the humiliation and embarrassment caused by Jack's removal from the play.  However, while Mr. Gasparini revoked the detentions, he upheld the decision to remove Jack from the play.

Petrosillo Letter, at 6.  In other words, Plaintiff challenged the detentions and was not required to serve them.  The process he received worked.  The Court also notes that plagiarism has been defined as "the appropriation or imitation of the language, ideas, and thoughts of another author, and representation of them as one's original work."  THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (Unabridged Ed., 1979).  More simply, plagiarism is "the act of using another person's words or ideas without giving credit to the person."  MERRIAM-WEBSTER DICTIONARY, available at www.merriam-webster.com/dictionary/plagiarism.  Using these definitions, it appears that, even in defending himself, Plaintiff may have admitted plagiarism.

extracurricular activity." Id. at 73. The court therefore dismissed his procedural due process claim. Id. Other courts in this Circuit have reached similar conclusions. See, e.g., Kajoshaj v. City of New York, No. 11cv4780, 2013 U.S. Dist. LEXIS 9138 at *11 (E.D.N.Y. Jan. 23, 2013) (no protected property interest in advancing to a particular grade); Saggio v. Sprady, 475 F.Supp.2d 203, 210 (E.D.N.Y. 2007) (school could not be liable for a due process violation because "the District did not exclude [plaintiff] from attending school. It thus cannot be said that the District infringed upon her right to an education."); Immaculate Heart Cent. Sch. v. New York State Pub. High School League, 797 F.Supp.2d 204, 217 (N.D.N.Y. 2011) ("participation in interscholastic athletics is not protected by the process."). Plaintiff's exclusion from the play therefore did not deprive him of a constitutionally protected property interest. Plaintiff cannot make out a procedural due process claim, and the motion will be granted in this respect.

### b. Liberty Interest

Plaintiff's second due process claim alleges that he was deprived of his "liberty interest in his good name, reputation and standing in the community" without due process of law. Complt. at ¶ 47. Plaintiff describes this as a "stigma plus" claim.

"[A] stigma-plus claim . . . involves an 'injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus), without adequate process.'" Segal v. City of New York, 459 F.3d 207, 212 (2d Cir. 2006) (qutoing DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003) (internal citations omitted). Under this standard, "defamation is simply not enough to support a cognizable liberty interest," and "the deleterious effects which flow directly from a sullied reputation would normally also be insufficient." Valmonte v. Bane, 18 F.3d 882, 1001 (2d Cir. 1994). "[T]he impact that defamation might have on job prospects, or, for that matter, romantic aspirations,

friendships, self-esteem, or any other typical consequence of a bad reputation" does not constitute deprivation of a tangible property interest. Id. "[W]hen dealing with loss of reputation alone, a state law defamation action for damages is the appropriate means of vindicating the loss." Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir. 2004).

Second Circuit "cases have typically addressed 'stigma plus' claims in the context of termination of government employment." Doe v. Dept. of Public Safety ex rel. Lee, 271 F.3d 38, 51 (2d Cir. 2001). In cases where the alleged "plus" of the "stigma plus" analysis does not relate to loss of a government job, the "principles" from the employment-related cases "are sometimes difficult to apply." Id. In analyzing such claims, the Court of Appeals has found that the Supreme Court has attempted to draw a distinction between a due process claim and an ordinary state-law defamation claim brought against a state actor. Id. at 53. "The requirement that a plaintiff demonstrate some 'plus' factor–an alteration or impairment of 'a right or status previously recognized by state law' . . . –appears to be central to this effort." Id. (quoting Paul v. Davis, 424 U.S. 693, 711 (1976)). Thus, "[i]f the plaintiff can point to some material indicium of government involvement beyond the mere presence of a state defendant to distinguish his or her grievance from the garden-variety defamation claim, courts can be assured that § 1983 will not become 'a body of general tort law' duplicative of 'whatever systems may already be administered by the States.'" Id. (quoting Paul, 424 U.S. at 701). An action that "(1) alter[s] the plaintiff's legal status, and (2) is 'governmental in nature,'" qualifies under this standard. Id. at 56 (quoting McClary v. O'Hare, 786 F.2d 83, 89 (2d Cir. 1986)).

Plaintiff argues that he has met the requirements of a "stigma plus" claim because "[t]he Defendant's [sic] wrongfully denied Plaintiff' [sic] his property [interest] stemming from his status as a public-school student" and because "Defendants caused derogatory

remarks and false rumors about Plaintiff to become publicly known that tarnished his good name and reputation." Plaintiff's Brief in Opposition, dkt. # 10-1, at 8. Plaintiff's argument here is unpersuasive. First, Plaintiff apparently identifies the "plus" in the stigma-plus equation as his property interest in education. As explained above, Defendant's conduct did not deprive him of that property right. Plaintiff faced detention, not suspension, and he was not even forced to serve that two-day punishment. In the context of a stigma-plus claim, nothing that Plaintiff has alleged, or could allege, would indicate that Defendants did anything to alter his legal status. Plaintiff admits that he graduated from school. Second, Plaintiff complains of damage to his reputation and standing in the community, classic damages in a tort case. Such injuries do not identify any damage that would qualify for constitutional protection in the stigma-plus context.

Another case where the stigma-plus plaintiff did not complain of lost government employment is instructive in this respect. The court in Valmonte found deprivation of a tangible property interest when the plaintiff was included on the New York State Register of Child Abuse and Maltreatment. Valmonte, 18 F.3d at 994. Child-care employers are often required "to make inquiries to the Central Register to determine whether potential employees are among those listed." Id. at 995. If a potential employee's name is on the register, "the employer can only hire the individual if the employer 'maintain[s] a written record, as part of the application file or employment record, of the specific reasons why such person was determined to be appropriate' for working in the child or health care field." Id. at 996 (qouting SSL § 424-(a)(2)(a)). The court found that registration under this statute invoked a tangible property interest because "Valmonte alleges much more than a loss of employment flowing from the effects of simple defamation." Id. at 1001. The registry did "not simply defame Valmonte, it place[d] a tangible burden on her employment

prospects." Id.  This burden came because "by *operation of law*, her potential employers

will be informed specifically about her inclusion on the Central Register and will therefore

choose not to hire her.  Moreover, if they do wish to hire her, those employers are required

by law to explain the reasons why in writing."  Id. (emphasis in original).  More than the

effects of defamation, these requirements amounted to "a specific opportunity to seek

employment caused by a statutory impediment established by the state."  Id.  No such

state-established impediment is alleged here; the effects of the alleged defamation on the

Plaintiff are reputational and the type that normally flow from the tort of defamation.

Plaintiff has not alleged deprivation of a tangible property interest.   The Court will

therefore grant the motion in this respect as well.[4]

ii.    **Section 1983 Equal Protection (Disability) Claim**

Plaintiff's fifth cause of action, raised under 42 U.S.C. § 1983, alleges a violation of

his Fourteenth Amendment equal protection rights "based on his disability, of which

Defendant was on notice."  Complt. at ¶ 74.  The claim further alleges that "under the

Child Find provision of the Individuals with Disabilities Education Act (IDEA), all school

districts are required to identify, locate and evaluate all children with disabilities, regardless

of the severity of their disabilities.  This mandate includes all children who are suspected

of having a disability."  Id. at ¶ 75.  Plaintiff alleges that Defendants had sufficient

information to know he had a disability, and thus "had [an] affirmative duty to conduct [an]

evaluation of Plaintiff to determine if he was entitled to additional educational supports and

_____

[4]Defendants contend that Plaintiff's claims under the New York Constitution fail for
the same reasons that his claims under the Federal Constitution do.  Plaintiff does not
challenge this understanding in his brief, but argues only that his claims meet the federal
standards.  Since Plaintiff does not offer any argument as to why claims that fail under the
United States Constitution would survive under the New York Constitution, the motion is
granted in this respect as well.

services as a qualified disabled child." Id. at ¶¶ 76-77. Defendants failed to engage in such an evaluation. Id. at ¶ 78. These failings give rise to a Section 1983 claim, Plaintiff alleges, because "the actions taken herein by Defendant[s] were intended to deprive Plaintiff of his rights guaranteed by applicable and known federal law, and were done by Defendant[s] under color of state law." Id. at ¶ 79. Plaintiff alleges that he suffered money damages, as well as "physical and psychological harm, emotional distress, emotional distress [sic], embarrassment, humiliation, damage to his reputation, and other damages." Id. at ¶ 80.

Defendants contend that these allegations fail to state a claim. Treating the claim as one brought pursuant to the IDEA, they argue that Plaintiff, even if recognized as a student with a disability, would not have been entitled to any relief under the Act. Plaintiff was not suspended or removed from school, and under those circumstances the IDEA provides no protection. In addition, Plaintiff has graduated from the District and his claims are moot. The IDEA does not provide for monetary damages for the injuries that Plaintiff alleges he suffered. In any case, if Plaintiff's claim is that the District failed to provide him with a free and appropriate public education as required by the IDEA, he has failed to exhaust his administrative remedies and cannot bring a claim. Plaintiff concedes in response that he is not making a claim regarding "additional protections from discipline due to his disability." Plaintiff's Reply Brief, at 9. Instead, he contends, "Defendants failed to abide by the evaluation and implementations [sic] procedures for individual education plans and behavioral intervention plans as prescribed by Federal and New York [l]aw." Id. Defendants, Plaintiff insists, failed in their obligation to "identify, evaluate and implement an appropriate education plan and provide necessary assistance to Plaintiff in order to help him complete his school work and education at a competent and satisfactory level."

Id. at 10.  Plaintiff also contends that, as he brings his claim pursuant to Section 1983 and not the IDEA, he may obtain money damages.

The parties thus treat the claim as one brought pursuant to the IDEA.  The question here, then, is whether Plaintiff has properly pled an IDEA claim.  "The Individuals with Disabilities Education Act . . . offers States federal funds to assist in educating children with disabilities."  Endrew F. v. Douglas County Sch. Dist. RE-1, 137 S.Ct. 988, 993 (2017) (citing 20 U.S.C. § 1400 et seq.).  "In exchange for the funds, a State pledges to comply with a number of statutory conditions.  Among them, the State must provide a free appropriate public education–a FAPE, for short–to all eligible children."  Id.  The FAPE is achieved through a careful process between parents, teachers, and school administrators that leads to an "individualized education program ("IEP").  Id. at 994.  "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child."  Id. (quoting Board of Ed. of Hendrick Hundson Central School Dist, Westchester Cty. v. Rowley, 458 U.S. 176, 181 (1982)).  The Act provides procedures for parents to dispute the contents of the IEP, ranging from informal meetings to "due process hearings" before educational agencies.  id.  When the "administrative process" concludes, "the losing party may seek redress in state or federal court."  Id.

Under the statute, "[s]hould a parent believe that the school district breached [its] IDEA duties by failing to provide their disabled child a FAPE, the parent may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement."  M.W. v. New York City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013). Parents seeking such reimbursement "must first file a due-process complaint which triggers an administrative-review process that begins with a hearing in front of an impartial hearing officer ("IHO").  Id.  At such a hearing, "(1) the D[epartment] O[f] E[ducation] must

establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." Id.  Appeals from the hearing are taken to a state official, after which "either party make seek review . . . by bringing a civil action in federal court[.]" Id.  "Before seeking judicial review in the federal courts, persons claiming to be aggrieved by procedural violations of the IDEA must first exhaust their administrative remedies." Garro v. Department of Educ., 23 F.3d 734, 737 (2d Cir. 1994).

Plaintiff's allegations under the IDEA are unclear.  Nothing in the Complaint indicates that the District, Plaintiff and his parents ever undertook the process described above.[5]  Plaintiff does not allege that he had an IEP, much less that a dispute occurred over that Plan which led to administrative proceedings giving rise to the instant Complaint. Instead, Plaintiff simply alleges that the District failed in its duty under the IDEA to identify him as a student with a disability and provide him with some sort of a plan to deal with his disability.  Plaintiff seeks money damages, not reimbursement for funds spent to educate him privately, for these alleged failings.  The Complaint therefore admits that Plaintiff failed to undergo any of the administrative processes that would give rise to an IDEA claim for

_____

[5]Plaintiff cites to the Code of Federal Regulations to argue that "the New York State Education Department must ensure that each public-school district establishes and implements procedures that comply with minimum federal requirements concerning these procedures." Citing 34 C.F.R. § 300.530.  Neither Plaintiff's briefing nor Complaint makes clear what particular "procedures" Plaintiff is referencing.  The portion of the Regulations cited by the Plaintiff deals with the authority of school personnel to make "a change in placement . . . for a child with a disability who violates a code of student conduct." 34 C.F.R. § 300.530(a).  These procedures could hardly apply to the Plaintiff.  They involve a student who is "remove[d] . . . from his or her current placement to an appropriate interim alternative educational setting, another setting or suspension[.]" 34 C.F.R. § 300.530(b). Plaintiff never had an IEP and admits he was never removed from an educational setting.

failing to provide a FAPE.  Plaintiff frames his claim as a Section 1983 claim, but even under those circumstances a Plaintiff must generally exhaust administrative remedies. Taylor v. VT. Dep't of Educ., 313 F.3d 768, 789 (2d Cir. 2002).   Plaintiff also seeks monetary damages separate from those available under the statute; but "[a] plaintiff cannot evade the IDEA's exhaustion requirement simply by framing his or her action as one for monetary relief."  Id.  Plaintiff does not even attempt to avail himself of the "futility" or "inadequacy" exceptions to this exhaustion requirement, arguing instead only in general terms.  Id. at 789-790.  The allegations in the Complaint and Plaintiff's argument make clear that he seeks damages for the Defendants' alleged failure to comply with the statute's requirements for providing education to the disabled; filing his Complaint as a Section 1983 claim seeking monetary damages cannot avoid the exhaustion requirement. The Court will grant the Defendants' motion in this respect.[6]

### C.    Rehabilitation Act

Count Six of Plaintiff's Complaint alleges that Defendants violated the Section 504 of the Rehabilitation Act.  Plaintiff alleges that he was entitled to reasonable accommodations because of his disability under Section 504, 29 U.S.C. § 794(a).  Complt. at ¶ 83.  Defendants were well-aware of Plaintiff's history of depression, anxiety and other

---

[6]Plaintiff does not respond to Defendants' argument that he cannot make out an IDEA claim because he has graduated high school.  Plaintiff certainly could not obtain any prospective relief funding compensatory education after his graduation.  See J.M. v. Kingston City Sch. Dist., No. 14cv542, 2015 U.S. Dist. LEXIS 157673 at *46-47 (N.D.N.Y. Nov. 23, 2015).  "'Compensatory education' is prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education."  Somoza v. N.Y. City Dep't of Educ., 538 F.3d 106, 109 n.2 (2d Cir. 2008) (quoting Burr v. Ambach, 863 F.2d 1071 (2d Cir. 1988)).  "An award of compensatory education is appropriate only for gross violations of the IDEA."  Id.  Plaintiff has not alleged that he was deprived a FAPE, and has instead admitted that he graduated high school.  He could not make out a claim in this respect.

health problems, which entitled him to protection under the statute.  Id. at  ¶¶ 84-85.

Plaintiff's disability helped cause his failures in writing the paper he was accused of

plagiarizing.  Id. at ¶ 86.  Defendants' actions in removing Plaintiff from the school play

undermined his ability to manage his illness by "depriv[ing] Plaintiff of a substantial portion

of [the] outlets and resources" he used to cope with stress and anxiety.  Id. at ¶ 87.

Section 504 of the Rehabilitation act provides that "'[n]o otherwise qualified

individual with a disability . . . shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance.'" B.C. v. Mount Vernon Sch.

Dist., 837 F.3d 152, 158 (2d Cir. 2016) (quoting 29 U.S.C. § 794(a)).  A plaintiff makes out

a prima facie case under the Rehabilitation Act by showing that "(1) plaintiff is a 'qualified

individual with a disability;' (2) plaintiff was 'excluded from participation in a public entity's

services, programs or activities or was otherwise discriminated against by [the] public

entity;' and (3) 'such exclusion or discrimination was due to [plaintiff's] disability.'" Id.

(quoting Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009)).  "Exclusion or discrimination

may take the form of disparate treatment, disparate impact, or failure to make a

reasonable accommodation." Id.  The Act requires that "'an otherwise qualified

handicapped individual must be provided with meaningful access to the benefit that the

grantee offers . . . . [T]o assure meaningful access, reasonable accommodations in the

grantee's program or benefit may have to be made.'" Dean v. Univ. at Buffalo Sch. of

Med. & Biomedical Scis., 804 F.3d 178, 186 (2d Cir. 2015) (quoting Alexander v. Choate,

469 U.S. 287, 301 (1985)).

Though the Rehabilitation Act does not have an exhaustion requirement, Courts

have sometimes applied such a requirement in the context of complaints about disability

discrimination in education. Courts are clear that "potential plaintiffs with grievances related to the education of disabled children generally must exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA (such as the ADA or the Rehabilitation Act)." Polera v. Board of Educ., 288 F.3d 478, 482 (2d Cir. 2002). A failure to exhaust administrative remedies deprives the Court of subject matter jurisdiction. Id. Here, Plaintiff also brings a claim under the Rehabilitation Act. Those claims are grounded, however, in the District's alleged failure to provide Plaintiff with an education that accommodated his disability. As explained above, he has failed to exhaust his administrative remedies on such claims.

The Supreme Court has also recently explained that a Plaintiff bringing a claim based in part on the IDEA and in part on the operation of other disability discrimination statutes must exhaust the administrative remedies available under the IDEA when the "lawsuit seeks relief for the denial of a free appropriate public education." Fry v. Napoleon Cmty. Sch. Dist., 137 S.Ct. 743, 754 (2017). "If the lawsuit charges such a denial, the plaintiff cannot escape" the statutory exhaustion requirement "merely by brining [his] suit under a statute other than the IDEA" such as the Rehabilitation Act or the Americans with Disabilities Act. Id. Thus, to the extent that he seeks to bring an IDEA claim on the basis of the District's alleged failure to provide a FAPE, the Defendants' motion must be granted for failure to exhaust administrative remedies.

Defendants contend that Plaintiff has neither exhausted his administrative remedies nor pled facts sufficient to make plausible a claim for relief under the Rehabilitation Act. Plaintiff simply contends that he is disabled within the meaning of the Act, and that "[b]ecause of the actions of the Defendants, Plaintiff has suffered, and continues to suffer, physical and psychological harm, emotional distress, embarrassment, humiliation, damage

to his reputation, and other damages.

The Court will grant the Defendants' motion in this respect as well. Plaintiff pled facts which make his Rehabilitation Act claim impossible. While Plaintiff may indeed have alleged that he suffers from a disability of which Defendants were aware, he has not alleged that he was excluded from any program because of that disability. The allegations in the Complaint are that Plaintiff was accused of plagiarism and prevented from participating in the school play because of this alleged plagiarism. Making all inferences in Plaintiff's favor, the Complaint might also be read to say that Plaintiff failed to attribute sources in his paper as a result of his mental impairments. The Complaint could also be read to allege that preventing Plaintiff from participating in the school play prevented him from accessing programming that helped to treat his disability. These allegations do not, however, state a claim that Plaintiff was excluded from a program because of his disability. First, Plaintiff admits that he continued to attend school and continued to take the course in which he was accused of plagiarism. Second, while Plaintiff was excluded from the play, his Complaint admits that he was excluded because of his supposed plagiarism, and not because of his disability. As such, Plaintiff has failed to state a claim under the Rehabilitation Act.

Plaintiff fails to address Defendants' argument that he was required to exhaust his administrative remedies before bringing the claim. To the extent that Plaintiff's claim under the Rehabilitation Act is that Defendants failed to provide him with an appropriate educational setting because of his disability, the Court finds that Plaintiff failed to exhaust his administrative remedies. The Court will therefore grant the motion on this claim as well.

**C. New York Human Rights Law**

Plaintiff's seventh claim alleges that Defendants violated the New York State Human Rights Law, NY Executive Law § 296, et seq., by discriminating him in the terms, conditions, and privileges of his school attendance because of his disability. Comptl. at ¶ 93. Defendants contend that New York law does not permit students to raise such a claim against their school district. The New York Court of Appeals has found that the State Department of Human Rights, charged with enforcing the Human Rights Law, lacks jurisdiction over public school districts. <u>Matter of North Syracuse Cent. School Dist. v. New York State Div. of Human Rights</u>, 19 N.Y.3d 481, 495 (2012). In other, words, the Court found that a public school district is not subject to Section 296(4) of the Human Rights Law, the provision that Plaintiff attempts to use to sue the Defendants here. The motion will therefore be granted in this respect too.

## IV.   Conclusion

For the reasons stated above, Defendants' motion to dismiss, dkt. # 7, is hereby GRANTED. The case is dismissed.

Thomas J. McAvoy
Senior, U.S. District Judge

**IT IS SO ORDERED**.

Dated: April 11, 2017

23